UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Shelton Hightower | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 16 CV 50314 |
| | ) Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

In May 2012, plaintiff Shelton Hightower was diagnosed with Stage III rectal cancer. He was 47 years old. After the diagnosis, plaintiff began treatment and also applied for disability insurance benefits. The cancer treatment was extensive, lasting over a year. Plaintiff underwent multiple rounds of chemotherapy and radiation, which caused him to lose a significant amount of weight. At one point, the treatments were stopped because the side effects were too severe. He was operated on twice, and part of his bowel was removed. After the second surgery, which was required to address an obstructed bowel, he stayed in the hospital for a lengthy period. He now has to use a colostomy bag and a cane. But, fortunately, the treatment worked. By July 2013, the cancer was in remission and treatments were stopped with plaintiff reporting feeling less tired.

During this same period, plaintiff's disability claim was percolating through the initial stages of the Social Security administrative system. In February 2013, an initial medical reviewer denied plaintiff's claim on the ground that the cancer had been "completely removed" after the surgeries. R. 268. In December 2014, when a hearing was held before an administrative law judge ("ALJ"), the cancer had been in remission for over a year, and plaintiff was no longer

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

claiming that he was disabled because of it. Instead, his claim was based on a new set of problems that emerged toward the end of the cancer treatment. In late 2012, plaintiff was diagnosed with diabetes and hypertension. Around this time, he first began complaining to his oncologist, Dr. Fauzia Khattak, that he had tingling and numbness in his feet. On July 22, 2013, Dr. Khattak diagnosed plaintiff with peripheral neuropathy.[2] Dr. Khattak and plaintiff's other doctors were unsure then—and are still unsure now—whether the neuropathy was caused by the diabetes or the chemotherapy or perhaps both.

Most of the evidence relating to the neuropathy was developed in the remission period—*i.e.*, after July 2013. During this time, plaintiff continued to see Dr. Khattak at three-month intervals to monitor the cancer.[3] She periodically noted that plaintiff complained about the neuropathy, but also noted that he was otherwise doing well. Plaintiff was also being seen by his general physician, first Dr. Sy and later Dr. Guenev. They too noted the complaints about neuropathy. Dr. Sy referred plaintiff to a podiatrist, Dr. Mertzenich, who saw plaintiff for a single visit on September 18, 2013. Dr. Mertzenich administered the Semmes-Weinstein monofilament test, in which a 10-gram monofilament is applied to the patient's toes. This test revealed that plaintiff had no sensation in eight of his ten toes.

Shortly before the hearing in December 2014, Dr. Khattak completed a form entitled Post Cancer Treatment Medical Source Statement. Ex. 18F. Dr. Khattak observed that plaintiff had neuropathy "from diabetes and contributed to by previous chemo"; that plaintiff was taking medications prescribed by his general physician; that plaintiff could walk one to two city blocks before stopping; that plaintiff could sit about four hours and stand/walk less than two hours on a normal work day; that plaintiff would be off task 5% of the day; that plaintiff had no limitations

---

[2] According to the Mayo Clinic website, peripheral neuropathy is caused by damage to the peripheral nerves that "often causes weakness, numbness and pain, usually in [the] hands and feet."
[3] Plaintiff saw Dr. Khattak five times by this Court's count.

with reaching, handling, or fingering; that plaintiff would need two unscheduled breaks each day, for 30 minutes each; that plaintiff did not need to keep his feet elevated; and that plaintiff would miss about two days a month.

At the hearing, plaintiff testified about his current condition. As summarized by the ALJ, plaintiff made the following assertions: his left hip was hurting; he was taking Gabapentin for his neuropathy; he had a colostomy bag that he flushed out three times a day, a process taking 20 minutes each time; he had numbness in his fingers all the time; he had daily swelling in his left leg and feet; and he had to elevate his feet and lie down to relieve the swelling. R. 28. A vocational expert then testified. No medical expert was called.

On March 19, 2015, the ALJ issued a decision with a mixed outcome. The ALJ first found that plaintiff qualified as disabled for the 15-month period when his cancer was active. The ALJ agreed that plaintiff had "significant levels of fatigue and pain" from the "obviously extensive" cancer treatments. R. 25-26. In the second half of the decision, the ALJ found that plaintiff's problems lessened after the cancer treatments were stopped. The ALJ acknowledged that plaintiff continued to suffer from "some lower extremity neuropathy," but found that these problems were not severe enough to prevent him from working at a sedentary job. R. 31. The ALJ gave little weight to Dr. Khattak's opinion based on the following reasons: (i) Dr. Khattak's treatment notes "contain few supportive findings"; (ii) there were "no abnormal neurological findings on examinations"; (iii) she had not "seen the claimant in approximately ten months" and thus "no longer [had] longitudinal familiarity"; and (iv) she indicated that diabetes was "the primary source of neuropathy, a medical diagnosis for which she did not follow the claimant." R. 30-31. The ALJ found that the plaintiff's testimony was not credible because the record contained "normal objective findings in many medical examinations." R. 31.

3

**DISCUSSION**

Plaintiff raises four arguments for remand. One of them can be addressed quickly at the outset. Plaintiff notes that the ALJ "found that Plaintiff's disability ended on August 31, 2013, so that as of September 1, 2013, he was no longer disabled." Dkt. # 9 at 11. Plaintiff complains that the ALJ "did not explain" why she selected these dates. As framed by plaintiff, this argument suggests that the ALJ arbitrarily found that plaintiff's condition changed essentially overnight. But this argument overlooks the obvious rationale, which was that the cancer treatment ended in July 2012 and plaintiff's symptoms improved thereafter. This was not an arbitrary rationale.

Plaintiff's other three arguments are that the ALJ should have given controlling weight to Dr. Khattak's opinion; the ALJ conducted a flawed credibility analysis; and the ALJ improperly "played doctor." After reviewing these arguments, the Court finds that a remand is warranted. The Court does not find that the ALJ's analysis was shoddy or necessarily unpersuasive. Rather the Court's primary concern is that the ALJ's rationales were not supported by any medical opinion. As previously noted, no medical expert testified.

**I. Dr. Khattak's Opinion**

Plaintiff complains that the ALJ erred in giving little weight to Dr. Khattak's opinion. In making this argument, plaintiff dutifully lays out the procedural requirements of the treating physician rule. However, plaintiff does not thereafter tie his arguments to any failure to follow that specific framework, but instead focuses on the substantive reasons for the ALJ's conclusion.

As a preliminary but important observation, the Court notes that the Dr. Khattak's opinion is not one-sidedly in plaintiff's favor. In fact, several findings are at odds with plaintiff's allegations. For example, Dr. Khattak indicated that plaintiff would have no limitations with handling and fingering, a conclusion that seems to contradict plaintiff's testimony that he had

4

numbness in his hands. Dr. Khattak also answered "no" to the question about whether plaintiff would need to elevate his feet on the job, another point contradicting plaintiff's testimony. Some of Dr. Khattak's statements support the ALJ's conclusions. Dr. Khattak opined, for example, that plaintiff would be "off task" only 5% of the workday. It is true that certain findings support plaintiff, but even these are not far off from the ALJ's findings. For example, Dr. Khattak checked the box indicating that plaintiff could sit four hours in a normal workday, whereas the ALJ assumed he could sit for six hours. Dr. Khattak stated that plaintiff would miss about two days a month. This amount is enough to preclude work, but again, is only just over the dividing line that typically allows one absence a month. Based on these facts, the Government argues that Dr. Khattak's opinion affirmatively supports the ALJ's finding of no disability, a stronger claim than merely arguing that the report is neutral or agnostic. *See* Dkt. #16 at 3 ("The ALJ's decision finds support in the opinion of none other than plaintiff's treating oncologist."). But the Government's position is more aggressive than that taken by the ALJ who agreed that Dr. Khattak's opinion, if accepted, would require a finding that plaintiff was disabled.

Turning to plaintiff's specific criticisms, the main one is that the ALJ was wrong in concluding that Dr. Khattak's treatment notes provided "few supportive findings." Plaintiff argues that Dr. Khattak "examined him regularly" and "was watching for signs of neuropathy" and recorded that he complained of "numbness and tingling in his fingers and toes and his sensitivity to cold on multiple visits." Dkt. #9 at 9. Plaintiff also argues that the monofilament test performed by Dr. Mertzenich was a supportive finding. Plaintiff's argument has some strong and weak points.

One weakness is that the argument is pitched at a general level. It is true that Dr. Khattak's treatment notes support lower-level building blocks in plaintiff's argument (*e.g.* that

5

plaintiff had neuropathy and complained about numbness in his toes and other things). But these findings do not necessarily lead to the conclusion that he could not work any job. Put differently, the ALJ did not ignore these general complaints, but found that they would be accommodated by limiting plaintiff to sedentary job and allowing him to use a cane. So the deeper question is not merely whether plaintiff had neuropathy, but rather *how* severe it was. For example, was the numbness in plaintiff's toes enough to make him incapable of working a sedentary job?

But there is one aspect of plaintiff's argument that has validity. In concluding that there were "few supportive findings," the ALJ was relying on her own layperson analysis of Dr. Khattak's treatment notes. This argument—that the ALJ was "playing doctor"—is discussed further in Section III. As applied specifically to Dr. Khattak's opinion, however, this argument is somewhat undermined by the fact that Dr. Khattak made statements on the form suggesting that she had doubts about her opinion. Specifically, in three separate places, she emphasized that her treatment relationship focused on plaintiff's cancer, not on the neuropathy. *See* R. 868 ("Our focus is on cancer related [questions and] evaluation."); R. 866 ("I am *assuming* neuropathic pain. Again neuropathy may or may not be related to the previous chemo. He does have diabetes that can cause same.") (emphasis added); R. 866 (refusing to answer the question whether plaintiff could work full time because she believed it could not "be answered from oncology or cancer perspective"). Based on these statements, the ALJ reasonably could have concluded that Dr. Khattak doubted whether she was qualified to opine about plaintiff's neuropathy limitations. Translated in terms of the treating physician checklist, Dr. Khattak's treatment relationship (2nd factor) and her specialization (5th factor) supported giving her opinion less weight. Finally, as for the monofilament test, it is not clear whether Dr. Khattak was given a copy of that report or otherwise considered it in rendering her opinion.

Plaintiff raises one other criticism regarding Dr. Khattak's opinion. Plaintiff asserts that the ALJ made an "erroneous finding of fact" when she stated that Dr. Khattak had not seen plaintiff in ten months before the opinion was rendered on November 26, 2014. Dkt. #9 at 9. The ALJ relied on this fact to conclude that Dr. Khattak "no longer [had] longitudinal familiarity." R. 31. Plaintiff states, correctly, that this one statement was an error because his last visit with Dr. Khattak was on August 25, 2014, which would have meant that there was only a three month gap. This error certainly raises a concern, but at the same time, the ALJ earlier in the decision discussed the August 2014 visit with Dr. Khattak and noted that this visit consisted of "another unremarkable neurological examination." R. 29. The ALJ thus considered this evidence, raising a question as to whether the later statement about the 10-month gap was a harmless error.

In sum, the ALJ's rejection of Dr. Khattak's opinion can be criticized on several grounds. At the same time, the Court finds that the ALJ was entitled to give weight to the fact that Dr. Khattak had reservations about her own opinion and to the fact that her opinion supported several aspects of the ALJ's analysis. Arguably, these latter arguments neutralized the two criticisms above, rendering them harmless errors. However, given the Court's conclusion that a remand is justified based on plaintiff's remaining two arguments, the Court need not reach a definitive conclusion on this argument.

## II. Credibility Analysis

Plaintiff next argues that the credibility analysis was incomplete and unclear and that the ALJ relied solely on the purported lack of objective tests to substantiate plaintiff's subjective allegations. This Court finds that this argument supports a remand.

As for the issue of clarity and completeness, plaintiff asserts that the ALJ did not explicitly apply the factors set forth in SSR 96-7p (the regulation then in effect). Plaintiff

7

complains, for example, that the ALJ never considered his daily activities, which is one of these factors. As for medications, another factor under 96-7p, plaintiff alleges that the ALJ unjustifiably insinuated that no doctor prescribed the Gabapentin he was taking. Plaintiff counters that his doctors knew about and authorized this medication. Dkt. #9 at 12-13. As for the former argument, it is true that the ALJ did not specifically analyze his daily activities, although she did summarize his hearing testimony that described some of those same activities. R. 23, 28. As for the latter assertion about an unauthorized prescription, it is not clear that the ALJ drew the prejudicial inference suggested by plaintiff. [4] In fact, the ALJ noted at one point in the decision that the Gabapentin was prescribed by plaintiff's primary care doctor. *See* R. 30. In sum, this first argument is, by itself, a questionable ground for remand.

Plaintiff's better credibility argument is the assertion that the ALJ ran afoul of the well-known principle in Social Security disability litigation that, although ALJs may consider the objective evidence, they may not disregard subjective allegations "solely" because they are not confirmed by objective medical evidence. *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("as numerous cases (and the Social Security Administration's own regulation) make clear, an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain but only the applicant's or some other witness's say so"). Here, as plaintiff argues, the ALJ repeatedly emphasized that "there have been normal objective findings in many medical examinations." R. 31. This factor was undeniably the primary rationale supporting the ALJ's credibility finding. The more difficult question is whether it was the "sole" rationale. In its

---

[4] Plaintiff's argument seems to be based on the following statements: (i) "Records from Crusader Clinic show that in November 2013, Greg Campbell, PA-C prescribed Gabapentin, which is the same as Neurontin, to be taken three times a day, without a diagnosis or examination" (R. 29); and (ii) "[Plaintiff] has reported having neuropathy primarily in his lower extremities and has been taking Gabapentin that was not prescribed by his oncologist but a primary care provider whose objective findings are normal on examinations" (R. 30).

8

response brief, the Government argues that the ALJ, in fact, relied on other factors. The Government provides the following overview of these other factors:

> The primary factor, and that upon which plaintiff admits the ALJ relied, is the objective medical evidence. 20 C.F.R. § 404.1529(c)(2). Other factors include the length and type of treatment (the ALJ noted that chemotherapy had stopped in June 2013, and had only routine treatment thereafter); activities (much maligned by the Seventh Circuit); medication (chemotherapy stopped months earlier); and other factors (plaintiff used a cane, which the ALJ accommodated).

Dkt. #16 at 4-5. This analysis is more explicit than the ALJ's, but fails to persuade this Court that the ALJ truly relied on these other factors. For one thing, the Government implicitly concedes that the ALJ did not address plaintiff's daily activities. As for medications, the Government only focuses on the cancer chemotherapy treatments, and fails to address the use of Gabapentin in the remission period. After carefully analyzing the ALJ's decision, this Court is uncertain whether the ALJ considered these other 96-7p factors. For this reason, the case must be remanded.

### III. Playing Doctor.

This leads to the third argument, which has already been partially discussed in the first two sections of this order. Plaintiff argues that the ALJ made layperson judgments about the meaning and significance of various medical findings. The ALJ had to rely on her layperson intuitions because there was no medical opinion in the record addressing the neuropathy. The ALJ never ordered a consultative examination on this issue. The ALJ did not call a medical expert at the hearing. The ALJ gave no weight to the opinions of the State agency doctors who, in any event, did not opine on this issue. And finally, the ALJ disregarded the opinion of Dr. Khattak, finding that she lacked the necessary expertise and treatment relationship to opine on plaintiff's neuropathy. In short, plaintiff argues that the ALJ improperly played doctor. *See Lewis v. Colvin*, No. 14 CV 50195, 2016 U.S. Dist. LEXIS 115969, *11 n. 3 (N.D. Ill. Aug. 30, 2016) (courts, counsel, and ALJs must resist the temptation to play doctor). This Court agrees.

9

The ALJ's principal rationale for finding plaintiff not disabled was that the medical examinations contained mostly normal findings. This basic point was repeated throughout the decision. The Court has already noted how the sole reliance on this argument led to an incomplete credibility analysis. But there is another problem. Medical expertise is often required to assess what is "normal" or "significant" when diagnosing a particular ailment. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (ALJs must "rely on expert opinions instead of determining the significance of particular medical findings themselves").

Here, the ALJ culled various "normal" findings from the medical record, and then concluded that these findings cumulatively showed that plaintiff's problems were not that serious. Although the ALJ may ultimately be proven correct in relying on these "normal" findings, this Court cannot be sure that they were all relevant to the particular problems plaintiff was experiencing. For example, the ALJ noted that one doctor found that plaintiff was found to have normal "range of motion," but it is not clear to this Court that this finding was inconsistent with plaintiff's allegations of numbness in his toes and other related symptoms. Likewise, the ALJ gave weight to the statement in Dr. Mertzenich's notes stating that plaintiff had "normal foot morphology." Although the ALJ found this to be significant, it is not clear that Dr. Mertzenich viewed it the same way. There is no statement in his notes indicating as such. Moreover, during this same visit, Dr. Mertzenich conducted the monofilament test and found that plaintiff had no sensation in eight of ten toes. One of plaintiff's main gripes here is that the ALJ did not give any consideration to the monofilament test, which, as plaintiff notes, was objective evidence. Among other things, the ALJ did not explain how the positive finding on the monofilament test squared with the normal-foot-morphology finding. This is one of several areas where a medical expert could have provided assurance that the ALJ's analysis was sound.

Medical expertise was likewise needed to assess the range of tests and treatments available for a person with neuropathy. The ALJ found fault with the lack of objective tests confirming plaintiff's allegations and also suggested that plaintiff was only receiving routine treatment. Again, the ALJ may ultimately be right, but it is not clear at this point. In his reply brief, plaintiff asserts that "medication is the proper mode of treatment for neuropathy caused by chemotherapy." Dkt. # 17 at 4. Plaintiff's assertion is itself an example of doctor playing, but based on the current record, the Court cannot simply dismiss it. This is why a medical expert was needed

\* \* \*

As noted above, the Court does not find that the ALJ's rationales were either lacking in logic or evidence. Further, the Court notes that the evidence regarding plaintiff's problems in the remission period is not overwhelming. It consists mostly of a handful of seemingly routine doctor visits with no major treatments. Still, for the reasons stated above, the Court finds that, on balance, plaintiff has raised enough arguments to merit a remand. If there were any doubt about this conclusion, it would be dispelled by the Seventh Circuit's fairly recent ruling in *Engstrand v. Colvin*, 788 F.3d 655 (7th Cir. 2015), a case plaintiff cited three times in his opening brief.[5] *See* Dkt. #9 at 5 n.8, 13, 15. *Engstrand* is factually similar, and provides strong authority for plaintiff here. The claimant there had neuropathy caused by diabetes and his doctors administered the same monofilament test given to plaintiff. In fact, unlike here, the claimant in *Engstrand* was found to have normal sensation in his toes after taking the monofilament test.[6] Despite this negative finding, the Seventh Circuit concluded that the district court should have remanded

---

[5] This case was issued after the ALJ's decision. This Court is, therefore, is obviously not faulting the ALJ for not following it.

[6] In addition, the claimant in *Engstrand* arguably engaged in more vigorous daily activities than plaintiff here. These activities included "help[ing] on his parents' farm a few times a week (with tasks like picking up hay bales with a tractor)." *Id.* at 658.

11

based largely on the same arguments presented here. Specifically, the Seventh Circuit stated that the claimant's "severe pain stemming from his neuropathy need not be confirmed by diagnostic tests." *Id.* at 660. The Seventh Circuit faulted the ALJ for concluding that certain examination findings were inconsistent with the claimant's allegations when the claimant's own doctor did not flag them as being inconsistent. *Id.* Also, relying on *Stedman's Medial Dictionary*, the Seventh noted generally that a person "who cannot feel the monofilament may have neuropathy severe enough to lead to an ulcer or gangrene" and that the "development of diabetic neuropathy is poorly understood, and the response to treatment is unpredictable." *Id.* at n.1, n.2. The latter observation suggests that, even though neuropathy may not be serious in many cases, it is still possible that it is work-disabling in a subset of "unpredictable" cases. In its response brief, the Government did not mention or try to distinguish *Engstrand*, and this Court does not see a basis for distinguishing it. Thus, based on this case alone, a remand is required.

In sum, a remand is required so that the ALJ can call an expert or otherwise develop the record to address these questions. *See* HALLEX I-2-5-34A.1. The Court does not indicate that any particular result should be reached on remand.

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: January 11, 2018  By: _____
Iain D. Johnston
United States Magistrate Judge